**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Mar 08 2013, 8:29 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**VALERIE K. BOOTS**
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**BRIAN REITZ**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ALLEN G. PARKER, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1206-CR-503 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT, CRIMINAL DIVISION
The Honorable Sheila A. Carlisle, Judge
Cause No. 49G03-1104-MR-24881

**March 8, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

In this case, the appellant-defendant, Allen G. Parker, handcuffed his victim's legs together, bound his hands with duct tape, and wrapped his head with the tape. Parker then hit his victim in the head more than thirty times, strangled him, kicked him in the ribs and face, and struck him fifteen times in the upper extremities. The victim died as a result of these injuries.

Immediately after committing these offenses, which included robbery, confinement, and murder, Parker remained in the residence, showered, dressed in the victim's clothes, drank the victim's vodka, and snacked on some peanuts and chips. Parker was subsequently found guilty of all three crimes.

We reject Parker's contention that his convictions for both murder and confinement were barred under the continuous crime doctrine, because the evidence demonstrated that each offense was separate and distinct. We also find that Parker does not prevail on his claim of prosecutorial misconduct. As a result, we affirm the judgment of the trial court.

FACTS

Sometime in 2006, Parker was renting a residence in Marion County that was owned by Donna Klinck. At some point, Parker stopped paying rent and agreed to do household chores for Klinck in exchange for living there.

2

In September 2009, John Butsch, who was living in an adjacent house, purchased the residence from Klinck. Because Parker did not pay rent, Butsch and Parker engaged in several verbal confrontations. Butsch finally evicted Parker in April 2010.

On one occasion, before the eviction, Butsch locked his keys out of his house, and he had Parker hold a ladder so Butsch could enter the house through the storm window of the bathroom.

On April 5, 2011, Parker decided that since "I ain't got nothing else to do . . . I'll do it on this day," and walked to Butsch's residence around midnight carrying duct tape, handcuffs, and a metal pipe. Exs. 39-40, 64, 67, 71, 130, 131. Parker entered Butsch's residence through the bathroom and removed the storm window. While Butsch was sleeping, Parker started punching Butsch in the face. When Butsch awoke, the two began to fight. Parker handcuffed Butsch's legs together, used some of the duct tape to bind Butsch's hands and wrapped Butsch's head in the tape. Parker then kicked Butsch in the ribs, face, and head, and strangled Butsch until Butsch lost consciousness. Butsch later died as a result of his injuries.

Immediately after the incident, Parker stayed in the house, showered, dumped his clothes on the first floor, and put on some of Butsch's clothes. Parker drank some of Butsch's orange juice and vodka and snacked on peanuts and Doritos. Parker played music, "trashed" Butsch's residence to make it look like a burglary, took $1,161 in cash and Butsch's keys, and checked into a nearby Hampton Inn. Tr. p. 214-15.

3

Brian Sloan, who rented the lower floor of Butsch's residence, heard the loud music, saw an African-American male leaving Butsch's residence at approximately 9:00 that morning, and attempted to call Butsch several times without success. At some point, Sloan contacted the police. Indianapolis Metropolitan Police Department (IMPD) Officer Jennifer Gabel drove to the scene, entered Butsch's house, and observed Butsch's body in the bedroom with his ankles still handcuffed and his head and hands duct-taped. Based on statements from both Sloan and Klinck, IMPD officers began to search for Parker as a suspect.

The police located Parker and arrested him on April 9, 2011. Parker had several hundred dollars in cash, a Hampton Inn key card, and a cell phone in his possession.

Parker signed a waiver of rights form and provided a videotaped statement to the police. At some point, Parker said, "I didn't try to kill him or nothin' like that . . . he just put up a fight. So I didn't intentionally try to kill him." Exs. 130, 131. However, Parker also stated that he "was fixin' to kill [Butsch]" and that the "the world is a better place [without Butsch]" because "[Butsch] is a very bad man." Id. Parker then commented that "it just was my mission to kill him, though, that's all." Id.

An autopsy was performed, revealing that Parker had inflicted twenty-nine blunt-force strikes to Butsch's head and fifteen strikes to Butsch's upper extremities. It was established that Butsch suffered multiple lacerations, broken nasal bones, a black eye, a fractured tooth, a large area of scalp hemorrhage, a subarachnoid hemorrhage, dislocation of the atlanto-occipatal joint, swelling of the brain, and fractures to four ribs. The

4

autopsy also showed that Butsch had been strangled and that he died from blunt force trauma to his head and body and asphyxiation.

Parker's fingerprints were found on the storm window and the vodka bottle. Butsch's keys were discovered in Parker's room at the Hampton Inn. DNA analysis showed that socks, jeans, a jacket, and a towel found at the scene had a mixture of Parker's and Butsch's DNA on them.

The State charged Parker with murder, robbery as a class A felony, and criminal confinement as a class B felony. A jury trial commenced on May 14, 2012. Following the presentation of the evidence, Parker's counsel made the following statements during closing argument:

> First off, I don't think Allen went there to kill him. I know that there's contradictory statements in his statement to the detective. But he also says in there, "I didn't try to kill him or nothing like that. I tried to, you know. But you know what I'm saying? He just put up a fight. So I didn't intentionally try to kill him, like I said. You know what I'm saying? I said, "I won't kill you or nothing like that." You know what I'm saying."

> He didn't intend to kill him. I think there's other evidence that supports that besides Allen's statement.

> You heard from Lisa Prater. She talked about in Exhibit 31 that the face is completely covered with duct tape except the nose. If you're going to kill him, why do you leave the nose open? He left it open so he could breathe. He wasn't trying to kill him.

> I think there's also evidence in the pictures that there was a struggle that went on in that house. You heard from Bobby Boggs that Mr. Butsch was a very tidy, neat person. And that when he looked at the house when Mr. Boggs [went] there, the house was in disarray.

5

There was a struggle that went on there. Allen talks about it that John is fighting back. I think that's further evidence of sudden heat.

And I think the most telling evidence of sudden heat is Dr. Sozio's testimony, 45 blunt force injuries. That's not somebody who is calmly killing somebody. That's somebody who is in a rage. That's sudden heat.

And we would ask that you convict Allen Parker of Voluntary Manslaughter, as a Class B felony. Thank you.

Tr. p. 436-38.

In response to the sudden heat argument, the deputy prosecutor remarked:

If we can't be safe in our homes, if we can't be in our beds and if someone comes in and beats us to death while we sleep—if that's not murder, nothing is. He couldn't be safe anywhere. That's where he should be the most safe.

. . .

I would rather you believe he didn't do it, despite the confession, than believe that in our own beds, in our own homes we can't defend ourselves. And if we do, their crime is mitigated. That is offensive to any person who feels safe anywhere.

He murdered him. No doubt about it. [Think] . . . about the final moments of John Austin Butsch. Think about that.

It's midnight at your own home. You're lying in your own bed. Your door is locked.

You hear something come into your house. Hear it coming closer. You hear it coming into the bedroom. It's a person. It's a person you know doesn't like you.

He didn't like him. We all know that. And he gets there. And what does he do? He immediately hits you in the face with his fist. That's what he told the detective.

6

You're awakened in your bed, and someone begins to beat you. God, at this point you just want that to stop. I mean, losing your stuff, that's the best thing that's going to happen.

Can you imagine the fear that you're going to feel at that point? And then he—after he's been beating you, he breaks out the duct tape. And he puts it around his hands. He said he did his hands first.

And he shackles your feet. And he's continuing to beat you. At some point he knocks out your teeth. He breaks your nose.

He wraps the face—he wraps your face with duct tape. So not only can you not scream out or fight at this point, but the blood that's coming from your broken nose and your broken teeth are going down your throat into your lungs, beginning to suffocate you. At some point your neck is broken. You're choked.

That's what John Butsch endured from this man for no reason.

Tr. p. 445-48.

Parker was found guilty as charged, and the trial court entered a judgment of conviction for murder, robbery as a class B felony, and criminal confinement as a class D felony. Parker was subsequently sentenced to an aggregate term of sixty-five years of incarceration. Parker now appeals.

DISCUSSION AND DECISION

I. Multiple Convictions

Parker first claims that the conviction for criminal confinement must be set aside. Specifically, Parker argues that convicting him of both murder and confinement violates

7

the continuous crime doctrine because his conduct in killing Butsch was "so compressed in time, place and singleness of purpose . . . as to constitute . . . one crime." Appellant's Br. p. 4.

In resolving this issue, we note that the continuing crime doctrine essentially provides that actions sufficient in themselves to constitute separate criminal offenses may be so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction. Riehle v. State, 823 N.E.2d 287, 296 (Ind. Ct. App. 2005). On the other hand, the "continuing crime doctrine does not apply to factual situations where a defendant is charged with two or more distinct chargeable crimes." Walker v. State, 932 N.E.2d 733, 737 (Ind. Ct. App. 2010). The continuing crime doctrine applies only when a defendant is charged multiple times with the same offense or multiple times with the same offense and a lesser included offense. Id.

When examining the above, it is apparent that Parker's convictions for murder and criminal confinement do not violate the continuing crime doctrine because they are distinct offenses. Id. More specifically, Parker committed criminal confinement when he bound Butsch's hands with duct tape and his ankles with handcuffs. Appellant's App. p. 37. On the other hand, the evidence demonstrated that Parker committed murder when he killed Butsch by inflicting blunt force injuries and/or asphyxiating Butsch. Tr. p. 232. As a result, it was not error to convict Parker of both criminal confinement and murder.

## II. Prosecutorial Misconduct

Parker also argues that his convictions must be reversed because the deputy prosecutor committed misconduct during closing arguments. Specifically, Parker maintains that the deputy prosecutor improperly appealed to the jurors' fears and urging that he be convicted for reasons other than guilt in committing the charged offenses.

We initially observe that to properly preserve a claim of prosecutorial misconduct for purposes of appeal, a defendant must not only raise a contemporaneous objection but must also request an admonishment. If the admonishment is not given or is insufficient to cure the alleged error, the defendant must also request a mistrial. Washington v. State, 902 N.E.2d 280, 289-90 (Ind. Ct. App. 2009). When a defendant fails to object, he or she fails to preserve any claim of prosecutorial misconduct for appellate review and may only bring a claim for prosecutorial misconduct if fundamental error is asserted. Id. at 290.

Even though Parker alleges prosecutorial misconduct, he concedes that he failed to object, ask for an admonishment, or request a mistrial. As a result, Parker may now only seek review under the fundamental error doctrine. Id.

Fundamental error applies only when the error is so prejudicial that it makes a fair trial impossible. Schmidt v. State, 816 N.E.2d 925, 944 (Ind. Ct. App. 2004). A panel of this court has recently observed that "the fundamental error doctrine is being casually invoked whenever there is a failure to timely object at trial. This is not the purpose of the fundamental error doctrine, which is extremely narrow and reserved only for the most egregious circumstances." Hale v. State, 976 N.E.2d 119, 121 (Ind. Ct. App. 2012).

With regard to prosecutorial misconduct claims, the gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct. Washington, 902 N.E.2d at 90. We consider the propriety of the prosecutor's remarks in the context of the argument as a whole. Id. We also note that while prosecutors may not "phrase final argument in a manner calculated to inflame the passions or prejudice of the jury," Wiseheart v. State, 693 N.E.2d 23, 59 (Ind. 1998), there is no misconduct when the prosecutor does not inject anything into evidence that was not already there. English v. State, 575 N.E.2d 14, 16 (Ind. 1991).

On rebuttal, the deputy prosecutor argued that Parker's actions were not "sudden heat" because Parker went to Butsch's house, broke in, and began beating Butsch when Butsch was sleeping. Tr. p. 445-48. This contradicted Parker's representation that he acted out of "sudden heat"—in other words, "sudden heat" is not something that an actor can claim after having crawled through a window and beaten a victim to death. The deputy prosecutor explained that Parker's actions showed planning and intent, described what Parker did to Butsch, and requested the jury to imagine the events that were occurring. Id.

The evidence of Parker's brutal attack and Butsch's murder was already in evidence—in the form of photos, Parker's own words, and the testimony of various witnesses explaining the aftermath. Id. at 46, 48, 51-52. Parker even admits that Butsch's "killing was disturbingly brutal and vividly presented to the jury through multiple graphic photographs." Appellant's Br. p. 9. In short, it was not fundamental

error for the deputy prosecutor to explain to the jury—even in vivid language—what had been admitted into evidence and was already known. As a result, Parker's claim of fundamental error fails, and we decline to set aside the convictions.

The judgment of the trial court is affirmed.

RILEY, J., and BARNES, J., concur.